In the United States District Court
For the Southern District of Ohio
Western Division at Cincinnati

| | |
|---|---|
| Gregory Parks, Roger Parks, Kyle Parks, Jonathan Parks, Calvin Davis, and Jason Babcock, | Case No. 1:17-cv-448 |
| Plaintiffs, | Judge |
| v. | |
| Central USA Wireless, LLC, and Chris Hildebrant, | Jury demand endorsed hereon. |
| Defendants. | |

# Complaint

1. Plaintiffs Gregory Parks, Roger Parks, Kyle Parks, Jonathan Parks, Calvin Davis, and Jason Babcock ("Plaintiffs") bring this action against Defendants Central USA Wireless, LLC and Chris Hildebrant (collectively, "Defendants"). Plaintiffs seek appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Plaintiffs with time-and-one-half overtime wages for hours worked in excess of 40 hours per week as required by the Fair Labor Standards Act ("FLSA").

2. Defendant Chris Hildebrant is the founder, president, and CEO of Central USA Wireless, LLC, a wholly owned subsidiary of Morelia Group, LLC.

3. Plaintiffs worked for Defendants laying fiber lines on a contract with AT&T in Texas from August 2015 until April 2017.

## Jurisdiction and Venue

4. Under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), this Court has jurisdiction over Plaintiffs' FLSA claims.

5. Venue in this Court is proper under 28 U.S.C. § 1391(b) because Defendants reside in this district.

## Parties

**Gregory Parks**

6. Plaintiff Gregory Parks is a resident of Michigan.

7. At all times relevant herein, Gregory Parks was an "employee" of Defendants as defined in the FLSA.

8. Gregory Parks has given written consent to join this action.

**Roger Parks**

9. Plaintiff Roger Parks is a resident of Michigan.

10. At all times relevant herein, Roger Parks was an "employee" of Defendants as defined in the FLSA.

11. Roger Parks has given written consent to join this action.

**Jonathan Parks**

12. Plaintiff Jonathan Parks is a resident of Michigan.

13. At all times relevant herein, Jonathan Parks was an "employee" of Defendants as defined in the FLSA.

14. Jonathan Parks has given written consent to join this action.

**Kyle Parks**

15. Plaintiff Kyle Parks is a resident of Michigan.

16. At all times relevant herein, Kyle Parks was an "employee" of Defendants as defined in the FLSA.

17. Kyle Parks has given written consent to join this action.

**Calvin Davis**

18. Plaintiff Calvin Davis is a resident of Michigan.

19. At all times relevant herein, Calvin Davis was an "employee" of Defendants as defined in the FLSA.

20. Calvin Davis has given written consent to join this action.

**Jason Babcock**

21. Plaintiff Jason Babcock is a resident of Michigan.

22. At all times relevant herein, Jason Babcock was an "employee" of Defendants as defined in the FLSA.

23. Jason Babcock has given written consent to join this action.

**Central USA Wireless, LLC**

24. Defendant Central USA Wireless, LLC ("Central USA") is a domestic limited liability company organized under the laws of the state of Ohio.

25. Central USA is an "employer" of Plaintiffs as that term is defined by the FLSA.

26. Central USA was founded by Chris Hildebrant, who remains as Morelia's president and CEO.

27. "Central USA Wireless, LLC" is the corporate entity that appears on Plaintiffs'

paystubs for work they completed for Defendants.

28. Upon information and belief, Central USA applies the same employment policies, practices, and procedures to all employees at all of its locations, including policies, practices, and procedures relating to payment of overtime wages.

29. At all relevant times, Central USA has maintained control, oversight, and direction over Plaintiffs, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, and other practices.

30. At all relevant times, Central USA has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used by the FLSA.

31. Central USA's gross revenue exceeds $500,000 per year.

**Chris Hildebrant**

32. Chris Hildebrant is the president and CEO of Central USA, a wholly owned subsidiary of Morelia Group, LLC.

33. Hildebrant lives in Cincinnati, Ohio.

34. At all relevant times, Hildebrant has been an "employer" of Plaintiffs as that term is defined by the FLSA.

35. At all relevant times, Hildebrant has been actively involved in managing the operations of Central USA.

36. At all relevant times, Hildebrant has had control over Defendants' pay policies and the unlawful policies and practices alleged herein.

37. At all relevant times, Hildebrant has had power over personnel and payroll

decisions at Central USA.

38. At all relevant times, Hildebrant has had the power to stop any illegal pay practices that harmed Plaintiffs.

39. At all times relevant, Hildebrant has had the power to transfer the assets and liabilities of Central USA.

40. At all relevant times, Hildebrant has had the power to declare bankruptcy on behalf of Central USA.

41. At all relevant times, Hildebrant has had the power to enter into contracts on behalf of Central USA.

42. At all relevant times, Hildebrant has had the power to close, shut down, and/or sell Central USA.

## Facts

**Gregory Parks**

43. Gregory Parks worked for Defendants as a bore locator in Texas from September 2015 until July 2016, and again from February 27, 2017 until May 13, 2017.

44. Gregory Parks' job duties related to drilling holes in the ground with a bore rig and/or running fiber lines through the holes dug by his co-workers.

45. Gregory Parks completed his duties at the request and instruction of AT&T and Central USA. He was required to drill holes and lay fiber lines according to AT&T and Central USA's precise instructions.

46. Gregory Parks did not have discretion or authority to change where, how, or when he drilled, or laid fiber lines.

47. Gregory Parks' primary duties did not involve management of Defendants' enterprise or a subdivision thereof.

48. Gregory Parks did not direct the work of two or more other full time employees.

49. Gregory Parks did not have the authority to hire or fire other employees, nor were his recommendations with respect to hiring, firing, advancement, promotion, or other change in status of other employee given weight by Defendants.

50. Gregory Parks' primary duty did not involve office or non-manual work directly related to management or general business operations of Defendants or Defendants' customers.

51. Gregory Parks was not permitted to exercise discretion and independent judgment with respect to matters of significance relating to Defendants operations.

52. Gregory Parks regularly worked approximately 60 to 70 hours per week.

53. Gregory Parks logged his hours on either a sign in sheet or a time clock throughout his employment with Defendants.

54. Despite regularly working six days per week, and approximately 60 to 70 hours per week, Gregory Parks was not properly paid time and one half overtime wages by Defendants until he returned to work in February 2017.

55. Gregory Parks was paid $1,000 per week, plus per diem for each day worked, until Defendants changed his compensation to hourly in February 2017.

56. The paystubs Defendants' provided to Gregory Parks for the work he completed indicated he was paid an hourly wage for 40 hours per week.

57. From September 2015 until May 2016, Gregory Parks' paystubs showed that he was paid $25 per hour for 40 hours each week, and $100 per diem for each day worked.

58. Starting in May 2016, Gregory Parks' paystubs began to show that he was being paid $8.10 per hour for 40 hours of work. However, instead of receiving $100 per diem for each day worked (which usually worked out to $600 per week), he was now receiving $1,276 per week in per diem pay.

59. As a result, Gregory Parks was still receiving the same dollar amounts each week—usually $1,600 during weeks he worked six days. However, instead of being paid $1,000 as wages and $600 as per diem pay, he received $324 as wages, and $1,276 as per diem pay.

60. Starting in May 2016, Gregory Parks' per diem pay became part of his "regular rate" for purposes of calculating overtime.

61. Gregory Parks left his employment with Defendants in July of 2016 and returned home to Michigan.

62. Gregory Parks returned to work for Defendants in February 2017. Upon his return to work, Gregory Parks began receiving hourly wages of $22 per hour for all hours worked, and time and a half overtime pay for hours worked in excess of 40 per workweek, plus per diem of $80 per day.

**Roger Parks**

63. Roger Parks worked for Defendants as a bore-rig operator in Texas from September 2015 until July 2016, and again from February 27, 2017 until May 13, 2017.

64. Roger Parks' job duties included drilling holes in the ground with a bore rig and/or running fiber lines through the holes dug by his co-workers.

65. Roger Parks completed his duties at the request and instruction of AT&T and Central USA. He was required to drill holes and lay fiber lines according to AT&T and Central

USA's precise instructions.

66. Roger Parks did not have discretion or authority to change where, how, or when he drilled, or laid fiber lines.

67. Roger Parks' primary duties did not involve management of Defendants' enterprise or a subdivision thereof.

68. Roger Parks did not direct the work of two or more other full time employees.

69. Roger Parks did not have the authority to hire or fire other employees, nor were his recommendations with respect to hiring, firing, advancement, promotion, or other change in status of other employee given weight by Defendants.

70. Roger Parks' primary duty did not involve office or non-manual work directly related to management or general business operations of Defendants or Defendants' customers.

71. Roger Parks was not permitted to exercise discretion and independent judgment with respect to matters of significance relating to Defendants operations.

72. Roger Parks regularly worked approximately 60 to 70 hours per week.

73. Roger Parks logged his hours on either a sign in sheet or a time clock throughout his employment with Defendants.

74. Despite regularly working six days per week, and approximately 60 to 70 hours per week, Roger Parks was not properly paid time and one half overtime wages by Defendants until he returned to work in February 2017.

75. Roger Parks was paid $1,200 per week, plus per diem for each day worked, until Defendants changed his compensation to hourly in February 2017.

76. The paystubs Defendants' provided to Roger Parks for the work he completed

indicated he was paid an hourly wage for 40 hours per week.

77. From September 2015 until May 2016, Roger Parks' paystubs showed that he was paid $30 per hour for 40 hours each week, and $100 per diem for each day worked.

78. Starting in May 2016 through July 2016, Roger Parks' paystubs began to show that he was being paid a fluctuating payrate—sometimes $8.10 per hour, sometimes $10.30 per hour, sometimes $12.80 per hour—for 40 hours of work. However, instead of receiving $100 per diem for each day worked (which usually worked out to $600 per week), he was now receiving varying amounts as per diem pay, to ensure that he was always effectively receiving the same pay as he always had.

79. Beginning in August of 2016, Defendants began to pay time and a half overtime pay to Roger Parks. However, instead of paying his time and a half his regular hourly rate of $30 per hour, Defendants reduced Roger Parks' regular rate of pay to $14 per hour, and made up the difference through per diem pay, such that Roger Parks would continue to receive the same weekly pay as he had always received.

80. Starting in May 2016, Roger Parks' per diem pay became part of his "regular rate" for purposes of calculating overtime.

81. Roger Parks left his employment with Defendants in August of 2016 and returned home to Michigan.

82. Roger Parks returned to work for Defendants in February 2017. Upon his return to work, Roger Parks began receiving hourly wages of $25 per hour for all hours worked, and time and a half overtime pay for hours worked in excess of 40 per workweek.

**Jonathan Parks**

83. Jonathan Parks worked for Defendants as a laborer in Texas from September 2015 until February 2016.

84. Jonathan Parks' job duties included completing tasks related to laying fiber lines for fiber optics networks.

85. Jonathan Parks completed his duties at the request and instruction of AT&T and Central USA.

86. Jonathan Parks did not have discretion or authority to change where, how, or when he drilled, or laid fiber lines.

87. Jonathan Parks' primary duties did not involve management of Defendants' enterprise or a subdivision thereof.

88. Jonathan Parks did not direct the work of two or more other full time employees.

89. Jonathan Parks did not have the authority to hire or fire other employees, nor were his recommendations with respect to hiring, firing, advancement, promotion, or other change in status of other employee given weight by Defendants.

90. Jonathan Parks' primary duty did not involve office or non-manual work directly related to management or general business operations of Defendants or Defendants' customers.

91. Jonathan Parks was not permitted to exercise discretion and independent judgment with respect to matters of significance relating to Defendants operations.

92. Jonathan Parks regularly worked approximately 60 to 70 hours per week.

93. Jonathan Parks logged his hours on either a sign in sheet or a time clock throughout his employment with Defendants.

94. Despite regularly working six days per week, and approximately 60 to 70 hours per

week, Jonathan Parks was not paid time and one half overtime wages by Defendants.

95. Jonathan Parks was paid $600 per week, plus per diem for each day worked, from September 2015 until December 2015, and was paid $700 per week, plus per diem for each day worked, from December 2015 until February 2016.

96. The paystubs Defendants' provided to Jonathan Parks for the work he completed indicated he was paid an hourly wage for 40 hours per week.

97. From September 2015 until December 2015, Jonathan Parks' paystubs showed that he was paid $15 per hour for 40 hours each week, and $100 per diem for each day worked.

98. From December 2015 until February 2016, Jonathan Parks' paystubs showed that he was paid $17.50 per hour for 40 hours each week, and $100 per diem for each day worked.

99. Jonathan Parks left his employment with Defendants in February of 2016 and returned home to Michigan.

**Kyle Parks**

100. Kyle Parks worked for Defendants as a laborer in Texas from September 2015 until August 2016, and again from February 27, 2017 until May 13, 2017.

101. Kyle Parks' job duties included completing tasks related to laying fiber lines for fiber optics networks.

102. Kyle Parks completed his duties at the request and instruction of AT&T and Central USA.

103. Kyle Parks did not have discretion or authority to change where, how, or when he drilled, or laid fiber lines.

104. Kyle Parks' primary duties did not involve management of Defendants' enterprise

or a subdivision thereof.

105. Kyle Parks did not direct the work of two or more other full time employees.

106. Kyle Parks did not have the authority to hire or fire other employees, nor were his recommendations with respect to hiring, firing, advancement, promotion, or other change in status of other employee given weight by Defendants.

107. Kyle Parks' primary duty did not involve office or non-manual work directly related to management or general business operations of Defendants or Defendants' customers.

108. Kyle Parks was not permitted to exercise discretion and independent judgment with respect to matters of significance relating to Defendants operations.

109. Kyle Parks regularly worked approximately 60 to 70 hours per week.

110. Kyle Parks logged his hours on either a sign in sheet or a time clock throughout his employment with Defendants.

111. Despite regularly working six days per week, and approximately 60 to 70 hours per week, Kyle Parks was not properly paid time and one half overtime wages by Defendants until he returned to work in February 2017.

112. Kyle Parks was paid $600 per week, plus per diem for each day worked, from September 2015 until December 2015, was paid $700 per week, plus per diem for each day worked, from December 2015 until February 2016, and was paid $900 per week, plus per diem for each day worked, from February 2016 until August 2016. Defendants changed his compensation to hourly in February 2017.

113. The paystubs Defendants' provided to Kyle Parks for the work he completed indicated he was paid an hourly wage for 40 hours per week.

114. From September 2015 until May 2016, Kyle Parks' paystubs showed that he was paid $25 per hour for 40 hours each week, and $100 per diem for each day worked.

115. Starting in May 2016, Kyle Parks' paystubs began to show that he was being paid $8.10 per hour for 40 hours of work. However, instead of receiving $100 per diem for each day worked (which usually worked out to $600 per week), he was now receiving $1,176 per week in per diem pay.

116. As a result, Kyle Parks was still receiving the same dollar amounts each week—usually $1,500 during weeks he worked six days. However, instead of being paid $900 as wages and $600 as per diem pay, he received $324 as wages, and $1,176 as per diem pay.

117. Starting in May 2016, Kyle Parks' per diem pay became part of his "regular rate" for purposes of calculating overtime.

118. In August 2016, Defendants began to pay Kyle Parks overtime at time-and-a-half his regular hourly rate as it appeared on his paystubs. However, because his payrate was artificially deflated and he was receiving the majority of his income through a contrived "per diem" pay, he did not actually receive time-and-a-half his regular hourly rate.

119. Kyle Parks left his employment with Defendants in August of 2016 and returned home to Michigan.

120. Kyle Parks returned to work for Defendants in February 2017. Upon his return to work, Kyle Parks began receiving hourly wages of $20 for all hours worked, and time and a half overtime pay for hours worked in excess of 40 per workweek.

**Jason Babcock**

121. Jason Babcock worked for Defendants as a bore-rig operator and vacuum truck

operator in Texas from September 2015 until May 2016.

122. Jason Babcock's job duties included operating the vac truck, a machine that uses high pressure water to open holes for fiber lines.

123. Jason Babcock completed his duties at the request and instruction of AT&T and Central USA. He was required to open holes and lay fiber lines according to AT&T and Central USA's precise instructions.

124. Jason Babcock did not have discretion or authority to change where, how, or when he drilled, or laid fiber lines.

125. Jason Babcock's primary duties did not involve management of Defendants' enterprise or a subdivision thereof.

126. Jason Babcock did not direct the work of two or more other full time employees.

127. Jason Babcock did not have the authority to hire or fire other employees, nor were his recommendations with respect to hiring, firing, advancement, promotion, or other change in status of other employee given weight by Defendants.

128. Jason Babcock's primary duty did not involve office or non-manual work directly related to management or general business operations of Defendants or Defendants' customers.

129. Jason Babcock was not permitted to exercise discretion and independent judgment with respect to matters of significance relating to Defendants operations.

130. Jason Babcock regularly worked approximately 60 to 70 hours per week.

131. Jason Babcock logged his hours on either a sign in sheet or a time clock throughout his employment with Defendants.

132. Despite regularly working six days per week, and approximately 60 to 70 hours per

week, Jason Babcock was never paid time and one half overtime wages by Defendants.

133. Jason Babcock was paid $1,300 per week, plus per diem for each day that he worked.

134. The paystubs Defendants' provided to Jason Babcock for the work he completed indicated he was paid an hourly wage for 40 hours per week.

135. From September 2015 until May 2016, Jason Babcock's paystubs showed that he was paid $32.50 per hour for 40 hours each week, and $100 per diem for each day worked.

136. Jason Babcock left his employment with Defendants in May of 2016 and returned home to Michigan.

**Calvin Davis**

137. Calvin Davis worked for Defendants as a laborer and bore-rig operator in Texas from September 2015 until August 2016.

138. Calvin Davis' job duties included completing tasks related to laying fiber lines for fiber optics networks.

139. Calvin Davis completed his duties at the request and instruction of AT&T and Central USA. He was required to drill hole and lay fiber lines according to AT&T and Central USA's precise instructions.

140. Calvin Davis did not have discretion or authority to change where, how, or when he drilled, or laid fiber lines.

141. Calvin Davis' primary duties did not involve management of Defendants' enterprise or a subdivision thereof.

142. Calvin Davis did not direct the work of two or more other full time employees.

143. Calvin Davis did not have the authority to hire or fire other employees, nor were his recommendations with respect to hiring, firing, advancement, promotion, or other change in status of other employee given weight by Defendants.

144. Calvin Davis' primary duty did not involve office or non-manual work directly related to management or general business operations of Defendants or Defendants' customers.

145. Calvin Davis was not permitted to exercise discretion and independent judgment with respect to matters of significance relating to Defendants operations.

146. Calvin Davis regularly worked approximately 60 to 70 hours per week.

147. Calvin Davis logged his hours on either a sign in sheet or a time clock throughout his employment with Defendants.

148. Despite regularly working six days per week, and approximately 60 to 70 hours per week, Calvin Davis was never paid time and one half overtime wages by Defendants.

149. Calvin Davis was paid $900 per week, plus per diem for each day that he worked.

150. The paystubs Defendants' provided to Calvin Davis for the work he completed indicated he was paid an hourly wage for 40 hours per week.

151. From September 2015 until May 2016, Calvin Davis' paystubs showed that he was paid $22.50 per hour for 40 hours each week, and $100 per diem for each day worked.

152. Starting in May 2016, Calvin Davis' paystubs began to show that he was being paid $8.10 per hour for 40 hours of work. However, instead of receiving $100 per diem for each day worked (which usually worked out to $600 per week), he was now receiving $1,276 per week in per diem pay.

153. As a result, Calvin Davis was still receiving the same dollar amounts each week—

usually $1,600 during weeks he worked six days. However, instead of being paid $1,000 as wages and $600 as per diem pay, he received $324 as wages, and $1,276 as per diem pay.

154. Starting in May 2016, Calvin Davis' per diem pay became part of his "regular rate" for purposes of calculating overtime.

## Causes of Action

### Count 1
### Failure to Pay Overtime Wages – Fair Labor Standards Act
### (On behalf of Plaintiffs against all Defendants)

155. Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

156. Plaintiffs worked more than forty hours in one or more workweeks during their employment with Defendants.

157. Defendants did not pay Plaintiffs one and a half times their normal hourly rate for time worked in excess of forty hours per workweek, but instead paid them a set weekly payrate no matter how many hours they worked.

158. By not paying Plaintiffs proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have willfully violated the FLSA.

159. As a result of Defendants' willful violations, Plaintiffs are entitled to damages, including, but not limited to, unpaid wages, liquidated damages, costs, and attorneys' fees.

### Count 2
### Untimely Payment of Wages – O.R.C. § 4113.15
### (On Behalf of Plaintiffs against Central USA Wireless, LLC)

160. Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

161. During all relevant times, Defendants were entities covered by O.R.C. § 4113.15.

162. O.R.C. § 4113.15(A) requires that Defendants pay Plaintiffs all wages, on or before the first day of each month, for wages earned during the first half of the preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned during the last half of the preceding calendar month.

163. Plaintiffs' unpaid wages have remained unpaid for more than thirty (30) days beyond their regularly scheduled payday.

164. In violating Ohio law, Defendants acted willfully, without a good faith basis and with reckless disregard to Ohio law.

165. As a result of Defendants' willful violation, Plaintiffs are entitled to unpaid wages and liquidated damages, as stated in O.R.C. § 4113.15.

**WHEREFORE**, Plaintiffs Gregory Parks, Roger Parks, Jonathan Parks, Kyle Parks, Calvin Davis, and Jason Babcock pray for all of the following relief:

A. Unpaid overtime pay and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

B. A declaratory judgment that the practices complained of herein are unlawful under the FLSA;

C. Liquidated damages under O.R.C. § 4113.15;

D. An award of prejudgment and post-judgment interest;

E. An award of costs and expenses of this action, together with reasonable attorneys' fees and expert fees; and

F. Such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

/s/ Andrew Kimble
Andrew Biller (0081452) (Lead Counsel)
Andrew Kimble (0093172)
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
513-651-3700 (Phone)
513-665-0219 (Fax)
(*abiller@msdlegal.com*)
(*akimble@msdlegal.com*)
www.msdlegal.com

## JURY DEMAND

Plaintiffs hereby demand a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

*/s/ Andrew Kimble*
*ANDREW KIMBLE*